**Affirmed and Opinion Filed August 13, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-01385-CV

## IN THE INTEREST OF C.M.F. AND E.A.F., CHILDREN

**On Appeal from the 254th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-16-06547**

## MEMORANDUM OPINION
Before Justices Francis, Brown, and Stoddart
Opinion by Justice Stoddart

This is an appeal from an order in a post-divorce enforcement proceeding. Michelle Fyfe filed the enforcement proceeding alleging Alistair Fyfe failed to pay her the value of half of his shares in his medical partnership and a portion of a distribution from the partnership pursuant to the terms of their agreement incident to divorce (AID). After an evidentiary hearing, the trial court rendered an enforcement order requiring Alistair to pay for the shares awarded to Michelle in three annual installments, pay the portion of the distribution described in the AID by a specific date, and pay Michelle's attorney's fees. On appeal, Alistair argues that the trial court's order improperly modifies the terms of the AID, Michelle did not satisfy the contractual requirements to be entitled to a percentage of the distribution, the order erroneously set specific dates for payment, and the award of attorney's fees should be remanded if any part of the order is reversed. For the reasons explained below, we affirm the trial court's order.

BACKGROUND

Alistair and Michelle entered into the AID on April 24, 2015. The trial court approved the

AID and incorporated it into the agreed final divorce decree signed on April 27, 2015. During the

marriage, Alistair, a physician, acquired 56 shares in Texas Heart Hospital of the Southwest, LLP

(THH). Alistair and Michelle agreed in the AID that Michelle would receive fifty percent of the

THH shares (i.e., 28 shares) as follows:

> MICHELLE LEE FYFE, is to receive as her sole and separate property and shall own, possess, and enjoy that property, and ALISTAIR IAN FYFE partitions, quitclaims, assigns, and conveys to MICHELLE LEE FYFE the following property:
>
> . . . .
>
> W-4.  50% of all Texas Heart Hospital of the Southwest Shares/Units owned by Alistair and/or Michelle Fyfe to be divided as set forth herein: Michelle Fyfe shall offer 10 shares of the Shares/Units, pursuant to the terms of the Partnership Agreement, to the Texas Heart Hospital of the Southwest. The value of an additional eighteen (18) shares/units will be awarded to Michelle Fyfe to be purchased by Alistair Fyfe at the same price paid per share by Texas Heart Hospital.
>
> The value of the additional eighteen (18) Texas Heart Hospital Shares awarded to Michelle Fyfe shall be held in constructive trust by Alistair Fyfe, for the benefit of Michelle Fyfe until such time as Michelle Fyfe has been paid in full for her right title and interest in the Texas Heart Hospital Shares. Alistair Fyfe shall pay Michelle Fyfe the full value of eighteen (18) Texas Heart Hospital Shares in three (3) equal annual installments. The first annual payment is due to be paid by Alistair Fyfe to Michelle Fyfe on or before 180 days from the date Michelle Fyfe receives her first payment from Texas Heart Hospital (for the 10 Shares/Units described above). The second annual payment will be due on the one year anniversary of the first annual payment being due.

The AID also required Alistair to pay, as part of the division of the estate of the parties,

certain debts, including:

> H-5  Three equal annual installments owed to Michelle for her interest in 18 Shares/Units of the Texas Heart Hospital of the Southwest pursuant to the terms in this Agreement Incident to Divorce.

The THH partnership agreement, referenced in the AID, restricts the transfer of shares, but

provides for transfers in the event of divorce. The partnership agreement requires the non-partner spouse, Michelle in this case, to send an offer to sell her shares to both the partnership and her former spouse. The former spouse, Alistair in this case, then has fifteen days to send notice of whether he elects to purchase the offered shares. If the former spouse does not elect to purchase the shares, the partnership "shall purchase" the shares for a price equal to the Appraised Value of the shares as defined in the partnership agreement. The partnership agreement states:

4.1.5 Transfer Upon Divorce of a Partner

(a) If the marital relationship of a Class P Partner is terminated by divorce and if the Divorced Partner does not succeed directly to the interest, if any, of his or her former spouse in any Units owned or held by the Divorced Partner at the time of the divorce, then the divorce decree shall specify the Units owned by the Divorced Spouse and shall require compliance with this Section 4.1.5 before any Transfer of Units, including a Transfer thereof into the name of the Divorced Spouse. The Divorced Spouse shall, within 30 days after the divorce becomes final, submit an Offer Notice concurrently to the Divorced Partner and the Partnership. The Offer Notice shall state that the Divorced Spouse offers to sell the Offered Units and shall also specify (i) the date the divorce became final, (ii) the number of Offered Units, and (iii) the address of the Divorced Spouse that is to be his/her location for Notices and other communications hereunder.

(b) Within 15 days after receipt of the Offer Notice, the Divorced Partner shall give a Response Notice to the Divorced Spouse and the Partnership stating whether such Divorced Partner elects to purchase the Offered Units. If the Divorced Partner does not elect to purchase all of the Offered Units, the Partnership shall purchase the Offered Units for a price equal to the Appraised Value of such Units.

The agreement further provides that the price to be paid by a purchaser of shares under section 4.1 "shall be the Appraised Value" of the shares. "Appraised Value" is a defined term in the partnership agreement and is determined based on a periodic appraisal of the partnership. At the time of the divorce, a share in THH was valued at $31,000.

The other provision of the AID at issue in this appeal concerns the June/July 2015 distribution from THH to Alistair. The parties agreed that if the upcoming distribution was calculated on the basis of Alistair owning 56 shares, Michelle would receive 17.2% of the distribution. If the distribution was calculated on the basis of ownership of 46 shares, Michelle

–3–

would not receive a portion of the distribution.  Section W-12 of the AID provides:

> W-12. If any portion of the June/July 2015 Texas Heart Hospital distribution is calculated on the basis of ownership of 56 shares rather than 46 shares, Michelle Lee Fyfe is awarded 17.2% of the total distribution.  However, under no circumstances, except as stated herein will Michelle Lee Fyfe get both purchase money/sales proceeds and a portion of the dividend payments because such is precluded by the Partnership Agreement. Alistair Fyfe will provide Michelle Fyfe a copy of the June/July 2015 Texas Heart Hospital partnership distribution check by certified mail within twenty-four (24) hours of his receipt of the June/July 2015 Texas Heart Hospital Distribution check.  In the event, it is determined that the June/July 2015 Texas Heart Hospital Distribution is calculated on the basis of 56 shares owned by Alistair rather than 46 shares, Alistair Fyfe will have fifteen (15) days from the date of receipt of the check to provide the 17.2% to Michelle Lee Fyfe as contemplated herein.

Michelle sent a written offer to sell the ten shares in THH to the partnership and Alistair in May of 2015.  In June, Alistair notified Michelle and the partnership that he would purchase the ten shares and close the transaction within 30 to 150 days as required by the partnership agreement.

Alistair received the June/July distribution check on or about July 13, 2015.  It is undisputed that Alistair did not pay any portion of this distribution to Michelle.

On August 11, 2015, Alistair elected to pay the purchase price for the ten shares by paying 25% of the purchase price in cash and paying the balance in three annual installments.  He delivered to Michelle a cashier's check in the amount of $77,500, representing the 25% partial payment for the ten shares.  The total purchase price for the ten shares, as indicated by the partial payment, was $310,000 or $31,000 a share.[1]

Under section W-4 of the AID, Alistair was to pay Michelle the full value of the eighteen remaining THH shares in three equal annual payments beginning 180 days after Michelle received her first payment from THH.  According to Michelle, that date should have been February 14, 2016, but Alistair did not make the first payment for the eighteen shares.  He took the position that

---

[1] 25% of 310,000 = 77,500.

the AID required him to buy the eighteen shares at the same price paid per share by THH, which was zero because THH did not buy the shares. Michelle then filed a petition for enforcement of the property division in the divorce decree and AID and later sought clarification of the terms of the AID.

Following an evidentiary hearing, the trial court signed an enforcement order containing findings, orders, and judgments, as relevant in this appeal, as follows:

- Alistair failed to make the first annual payment of $186,000[2] for the value of the eighteen shares pursuant to section W-4 of the AID.

- Ordered Alistair to pay Michelle the first annual payment by September 6, 2016.[3]

- Rendered judgment against Alistair in favor of Michelle for the amount of the first annual payment.

- Ordered Alistair to pay Michelle the second and third annual payments for the eighteen shares, both in the amount $186,000, on February 14, 2017 and 2018, respectively.

- Found that Alistair failed to pay Michelle $21,156, representing 17.2% of the June/July 2015 distribution.

- Ordered Alistair to pay that sum to Michelle by September 6, 2016.

- Rendered judgment against Alistair in favor of Michelle in the amount of $21,156, representing 17.2% of the June/July distribution.

- Rendered judgment against Alistair in favor of Michelle for attorney's fees related to this matter in the amount of $26,335.

- Ordered Alistair to pay Michelle the amount of attorney's fees rendered in the judgment by September 6, 2016.

The trial court denied Alistair's motions for reconsideration and for new trial and filed findings of fact and conclusions of law.

## STANDARD OF REVIEW

We review the trial court's ruling on a post-divorce motion for enforcement or clarification under an abuse of discretion standard. *DeGroot v. DeGroot*, 369 S.W.3d 918, 921 (Tex. App.—

---

[2] This represents the Appraised Value per share times the eighteen shares ($31,000 x 18 = $558,000) divided into three annual payments ($558,000 ÷ 3 = $186,000).

[3] The dates for were modified by a later order.

Dallas 2012, no pet.). A court abuses its discretion when it acts unreasonably, arbitrarily, or without reference to guiding rules and principles. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Beshears v. Beshears*, 423 S.W.3d 493, 499 (Tex. App.—Dallas 2014, no pet.).

In family law cases, legal and factual sufficiency challenges do not constitute independent grounds for asserting error, but are relevant factors in determining whether the trial court abused its discretion. *McCafferty v. McCafferty*, No. 05–16–00587–CV, 2017 WL 3124470, at *1 (Tex. App.—Dallas July 24, 2017, no pet.) (mem. op.). To determine whether the trial court abused its discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in its application of that discretion. *Id.* A trial court's findings are reviewable for legal and factual sufficiency of the evidence under the same standards that are applied in reviewing evidence supporting a jury's answer. *Id.* In evaluating a legal sufficiency challenge, we credit evidence that supports the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* In a factual sufficiency review, we examine all the evidence in the record and will reverse only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

The parties in a divorce proceeding may agree to the division of their property. TEX. FAM. CODE ANN. § 7.006(a). If the trial court finds the terms of such an agreement are just and right, the terms are binding on the court and it may incorporate the written agreement into the divorce decree. *Id.* § 7.006(b). An agreed property division incorporated into a final divorce decree is

treated as a contract and is construed according to the law of contracts. *Beshears*, 423 S.W.3d at 500.

Whether a contract is ambiguous is a question of law, which we review de novo. *See R & P Ent. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). A contract is ambiguous when its meaning is uncertain or doubtful or it is reasonably susceptible to more than one meaning. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A latent ambiguity exists when a contract is facially unambiguous, but its meaning is doubtful when applied to the subject matter because of a collateral matter. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282–83 (Tex. 1996). The ambiguity must become apparent when the contract is read in the context of surrounding circumstances. *See National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995). When a contract contains an ambiguity, its interpretation and the intent of the parties becomes a fact issue. *See Coker*, 650 S.W.2d 391 at 393–94.

## APPLICABLE LAW

A trial court that renders a final divorce decree retains jurisdiction to clarify and enforce the property division in the decree, including any contractual provisions under an agreement incident to divorce. TEX. FAM. CODE ANN. § 9.002. The court may render further orders to enforce the division of property made in the decree of divorce to assist in the implementation of or to clarify the prior order. *Id.* § 9.006(a). The trial court "may specify more precisely the manner of effecting the property division previously made if the substantive division of property is not altered or changed." *Id.* § 9.006(b); *see also id*. 9.007(a); *DeGroot*, 369 S.W.3d at 922. If a party does not receive payments of money as awarded in a divorce decree, the court may render judgment against the defaulting party for the amount of the unpaid payments. TEX. FAM. CODE ANN. § 9.010(b).

## ANALYSIS

### A. THH Shares

In his first issue, Alistair contends the AID is not ambiguous and the trial court erred because the enforcement order modifies the substantive division of property in the divorce decree and AID.

We begin by noting that the 56 shares in THH were community property and subject to a just and right division by the court in the divorce case. *See* TEX. FAM. CODE ANN. § 7.001. Pursuant to the AID, the court divided that community property by awarding Michelle, "50% of all [THH] Shares/Units owned by Alistair and/or Michelle." Because Michelle is not a physician, she cannot own the shares directly, so the AID provided a mechanism to carry out the property division. Michelle was to offer to sell ten shares to THH and Alistair would purchase the additional eighteen shares at the same price paid per share by THH. The terms of the AID assume that THH would buy the ten shares, at the price required by the terms of the partnership agreement, and Alistair would purchase the eighteen shares at the same price per share. That did not happen, however, because Alistair exercised his option to purchase the ten shares, a contingency not provided for in the AID.

Alistair argues the terms of the AID are unambiguous and literally obligate him to pay Michelle only "the same price paid per share" by THH for the eighteen remaining shares. He asserts that since THH did not buy the ten shares, he is only obligated to pay Michelle "the same price per share" for the eighteen shares, which is zero. In other words, Alistair contends the AID expresses the parties' intent that, solely at his discretion, Alistair could either: (1) allow THH to buy the ten shares at the Appraised Value of $31,000 a share and he would pay Michelle the same price per share for the eighteen shares, resulting in Michelle receiving $31,000 per share for all 28 shares; or (2) exercise his option to purchase the ten shares for $31,000 a share and keep the

remaining eighteen shares for no additional payment to Michelle.

We reject Alistair's argument and conclude the meaning of the AID is unclear in the circumstance where Alistair elected to purchase the ten shares offered to THH. *See Frendswood Development*, 926 S.W.2d at 282–83. A contract is ambiguous when its meaning is uncertain. *See Coker*, 650 S.W.2d at 393. In *Coker*, a property settlement agreement between spouses was ambiguous because it was unclear whether the husband guaranteed payment of $25,000 to the wife or simply assigned his interest in commissions owed to him. *Id.* at 394. The conflict between the wife's construction of one provision as a guarantee and other provisions of the agreement created "an ambiguity as to the intent of the parties as expressed in the written agreement and the decree." *Id.* In *Zeolla v. Zeolla*, the property agreement and divorce decree awarded the wife a portion of the husband's monthly retirement benefits "if retirement occurs at age 65." *Zeolla v. Zeolla*, 15 S.W.3d 239, 240–41 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). The husband, however, retired at age 57 and refused to pay retirement benefits to the wife. *Id.* Because the agreement was silent as to the husband's obligations if he retired at any age other than 65, the agreement was ambiguous and subject to clarification and implementation of the property division in an enforcement proceeding. *Id.* at 242.

The terms of the AID are clear about what happens if THH purchased the shares, but unclear about what happens if Alistair elected to purchase the ten shares. The meaning of the AID is uncertain in this scenario, therefore the AID was subject to the court's power to enter further orders to enforce the division of property, assist in implementing or clarifying the decree, or specify more precisely the manner of implementing the property division as long as the substantive division of property is not altered or changed. TEX. FAM. CODE ANN. § 9.006(a), (b).

Alistair's election to purchase the offered shares was not anticipated by the express terms of the AID. Had Alistair not elected to purchase the ten shares, Michelle would have received the

Appraised Value for all 28 shares. Alistair's construction of the AID permitting him to buy the ten shares and pay nothing for the remaining eighteen shares would render the provisions of the AID that Alistair pay and assume the debt for the remaining eighteen shares in three annual payments meaningless. *See Coker*, 650 S.W.2d at 394 (concluding property settlement agreement was ambiguous in part because alternative construction would render other parts of agreement surplusage).

We also reject Alistair's argument that the enforcement order improperly modified the division of property. The substantive division of property under the AID is the award to Michelle of fifty percent of all the THH shares owned by Alistair, which is 28 shares. The intent of the parties as expressed in the AID was that Michelle would be paid the same price for all of these shares, not just ten shares as Alistair claims. The partnership agreement established the price to be paid for shares in THH is the Appraised Value per share, which was $31,000 per share at the time of divorce. We conclude the trial court did not alter the substantive property division by ordering that Alistair pay the same price per share for the remaining eighteen shares in three annual payments as provided in the AID. Rather, the enforcement order implemented the intent of the property division reflected in the AID that Michelle receive the same price per share for all 28 shares awarded to her. *See DeGroot*, 369 S.W.3d at 923.

In his reply brief, Alistair argues that if the eighteen shares have a value, Michelle's remedy was to require him to sell the shares to THH as her constructive trustee. However, this argument was not raised by Alistair in the trial court and is not provided for by the terms of the AID. Further, the mere existence of this possibility does not show the trial court erred in its enforcement order. Accordingly, we would reject this argument even if it were timely. *See* TEX. R. APP. P. 33.1(a).

We overrule Alistair's first issue.

–10–

### B. June/July 2015 Distribution

In his second issue, Alistair argues the evidence is legally and factually insufficient to support the order that he pay 17.2% of the distribution to Michelle because she failed to prove that the distribution was based on ownership of 56 shares rather than 46 shares. He also argues Michelle was not eligible for a portion of the distribution because she later received partial payment towards the purchase of ten shares by Alistair.

The record here establishes that Alistair owned 56 shares at all times relevant to this case. Alistair elected to purchase the ten shares offered by Michelle, thereby preserving his ownership of 56 shares. Because Alistair elected to purchase the ten shares, no shares were ever transferred out of his name. Thus, he owned 56 shares at the time of the June/July 2015 distribution. Further, a lawyer for THH testified that Alistair is the current owner of the shares. The evidence is legally and factually sufficient to support the trial court's finding that the June/July 2015 distribution was calculated on the basis of Alistair's ownership of 56 shares.

Alistair contends that the AID precludes Michelle from receiving both "purchase money" and a portion of the June/July 2015 distribution. The sentence he relies on is part of section W-12 and states: "However, under no circumstances, except as provided herein will Michelle Lee Fyfe get both purchase money/sales proceeds and a portion of the dividend payments because such is precluded by the Partnership Agreement." We do not read this single sentence to negate the intent expressed in the rest of the AID. Under the terms of the AID, Michelle would receive payment for her 28 shares at some point in time because she could not own those shares in her own name. If all Michelle was entitled to receive was the value of those shares regardless of when the distribution was made, section W-12 would be meaningless and surplusage. Therefore, the AID otherwise provides that, in some situation, Michelle may receive both payment for her shares and a portion of the distribution.

Section W-12 addresses the issue of the timing of the distribution and the closing of the transfer of shares to THH. Of course no shares were ever transferred to THH as a result of Alistair's election to purchase the ten shares, but the section anticipated that if THH closed on the purchase of the ten shares before the distribution, Michelle would not receive a portion of the distribution because she had already received "purchase money/sales proceeds" for the shares. However, if the transfer did not close by the time of the distribution and the distribution was based on Alistair's ownership of 56 shares, Michelle would receive the stated percentage of the distribution.

Correctly construed, the AID provides that if Michelle received "purchase money/sales proceeds" before the June/July 2015 distribution was made, she would not be entitled to a portion of the distribution. However, if she did not receive "purchase money/sales proceeds" before the distribution and it was made on the basis of ownership of 56 shares, as was the case here, Michelle was entitled to 17.2% of the entire distribution as provided by the AID. Because she did not receive any payment for the ten shares before the distribution and the evidence shows the distribution was calculated based on ownership of 56 shares, Michelle is entitled to 17.2% of the distribution pursuant to the terms of the AID. The trial court did not abuse its discretion enforcing that provision of the AID.

We overrule Alistair's second issue.

## C. Order for payment by specific date

In his third issue, Alistair contends the trial court erred by granting judgments payable by specific dates and times, and at specific places because the AID is contractual and not enforceable by contempt.[4]

---

[4] We note that while the enforcement order requires Alistair to make payments by specific dates and times, and at specific place, the judgments do not.

Alistair argues that a contractual debt is not enforceable by contempt. He cites *In re Green*, 221 S.W.3d 645 (Tex. 2007) (orig. proceeding) for this proposition. We do not disagree with this principle or the court's holding in *Green*, which was a petition for a writ of habeas corpus following an order of imprisonment for contempt. *Id.* 221 S.W.3d at 646–47. But there is no contempt order before us. The trial court did not enforce the AID by contempt. We will not speculate about potential contempt proceedings should Alistair refuse to comply with the trial court's enforcement order. Essentially, Alistair is requesting that we issue an advisory opinion that the enforcement order would not support a future contempt proceeding if he refused to comply with the order. We will not and cannot render such an advisory opinion. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) (holding courts have no jurisdiction to render advisory opinions); *See also Hollingsworth v. Hollingsworth*, 274 S.W.3d 811, 819–20 (Tex. App.—Dallas 2008, no pet.) (refusing to address argument that clarifying order for payment of taxes pursuant to divorce decree was not enforceable by contempt because no contempt order was rendered).

We overrule Alistair's third issue.

## D. Attorney's Fees

Because we have rejected Alistair's other issues, we need not address his conditional issue regarding attorney's fees. *See* TEX. R. APP. P. 47.1.

### CONCLUSION

We affirm the trial court's order.

/Craig Stoddart/

CRAIG STODDART
JUSTICE

161385F.P05

–13–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.M.F. AND
E.A.F., CHILDREN

No. 05-16-01385-CV

On Appeal from the 254th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DF-16-06547.
Opinion delivered by Justice Stoddart.
Justices Francis and Brown participating.

In accordance with this Court's opinion of this date, the trial court's order and supplemental order on Michelle Fenner's petition for enforcement of property division are **AFFIRMED**.

It is **ORDERED** that appellee Michelle Lee Fenner, f/k/a Michelle Lee Fyfe, recover her costs of this appeal from appellant Alistair Ian Fyfe.

Judgment entered this 13th day of August, 2018.